**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYRONE SINGLETON,** | : | **Civil No. 1:13-CV-2711** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LAUREL HARRY,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION AND ORDER**

I.   **Factual Background and Procedural History**

We find ourselves endeavoring, once again, to write the final chapter in this longstanding legal saga, a case which has been marked by persistent, on-going confusion and ambiguity concerning the scope of the plaintiff's legal claims.

In 2013, Tyrone Singleton, who was at one time incarcerated in the Pennsylvania Department of Corrections, filed this lawsuit against Laurel Harry, the Superintendent of SCI Camp Hill. With respect to Defendant Harry, this case now proceeds on Singleton's claim that between December of 2012 and January of 2014, while he was a pretrial detainee at Camp Hill, he was placed in solitary confinement for 402 days without notice, an explanation, or an opportunity to challenge his placement in violation of the Fifth and Fourteenth Amendments' due process

1

guarantees.

Many judges have touched upon this case over the past ten years, and our collective efforts have narrowed, but not fully clarified, Singleton's claims. In our view, the stubborn ambiguity of these claims is driven, in large measure, by a unique constellation of facts which have not yet been fully analyzed by any court. Specifically, while Singleton may have initially enjoyed the status of a pretrial detainee for much of the time he was confined as SCI Camp Hill, near the end of his confinement he received a time-served sentence from the state courts. This time-served sentence, in essence, recast much of his initial pretrial detention retroactively as a period of custodial confinement governed by an entirely different legal paradigm. To date, no court has opined regarding how this changed circumstance affects the scope of Singleton's claims.

The tangled chronology of this case, which has fostered confusion regarding this single, remaining claim, began in 2012, when Tyrone Singleton, a New York state parolee whose supervision had been transferred to Pennsylvania, was charged in the Court of Common Pleas of Cumberland County with state DUI and reckless driving charges. Commonwealth v. Singleton, CP-21-CR-0003530-2012. Following a December 14, 2012, preliminary hearing, on December 17, 2012, Singleton was committed to SCI Camp Hill on a Pennsylvania Board of Probation and Parole

warrant based upon an apparent parole violation stemming from this new arrest. At the time that Singleton was taken into custody as a potential parole violator, he had been released on his state charges on an unsecured appearance bond. Therefore, the parole warrant was the only legal process holding Singleton.

On January 11, 2013, a New York state parole detainer was lodged against Singleton as a result of these new criminal charges. Thus, while Singleton faced pending state charges in Pennsylvania, he was initially confined at SCI Camp Hill based upon this state parole detainer from New York. This remained Singleton's custodial status until April 19, 2013, when his state bail was changed from an unsecured appearance bond to a nominal cash bond. Singleton never posted this cash bond. Therefore, beginning on April 19, 2013, two forms of legal process were holding Singleton: the parole violator warrants as well as the unsatisfied cash bond.

It is undisputed that Singleton remained confined at SCI Camp Hill subject to these various forms of legal process until February of 2014, when he was taken into custody by New York state officials. It is further uncontested that Singleton did not receive any individualized due process hearing, explanation, or consideration of his custodial status while he was held at SCI Camp Hill. However, state court records reveal that Singleton's legal status eventually changed significantly during the course of his confinement. While Singleton was initially held solely as a pretrial

detainee based upon the New York parole detainer, and then later was held both as a parole violator and as a detainee that had not posted bond by the close of his incarceration, his status changed to that of a convicted defendant who had received a time-served sentence.

As we consider Singleton's journey through the legal system in 2013, we note that the history of his state criminal case was marked by an erratic meandering path. Initially, on May 3, 2013, Singleton entered a guilty plea to his state charges. Commonwealth v. Singleton, CP-21-CR-0003530-2012. One month later, however, on June 4, 2013, the court granted Singleton's motion to withdraw this guilty plea. Id. Singleton's state case then proceeded forward until January 7, 2014, when he reinstituted his guilty pleas to these DUI and reckless driving charges. He was then promptly sentenced to a term of 6 months to one year on his DUI offense and was given credit for up to 390 days of time served. Singleton received no additional punishment for the state reckless driving charge according to state court records. Id.

With his pending state case resolved through what was effectively a time-served guilty plea and sentence, Singleton was then remanded to the custody of New York state officials on February 14, 2014. It appears that Singleton's New York state parole was revoked on February 27, 2014, he was given some credit for the time he spent incarcerated on the New York detainer by New York state officials, and he

was re-released on parole on March 14, 2014.

It is against this factual backdrop marked by dual decisions in Pennsylvania and New York which resulted in time-served sentences for Singleton that the plaintiff brought this lawsuit. (Doc. 1). Initially, the district court viewed Singleton's complaint as bringing both Eighth Amendment and Fifth Amendment due process claims. After consideration of several dispositive motions, the district court dismissed all of these claims, and Singleton appealed.

On appeal, the Third Circuit affirmed the district court's judgment with one exception. Construing Singleton's complaint as raising a series of due process claims, the appellate court concluded that one of these claims—a claim that Singleton had been held in solitary confinement without a hearing—survived. As the Court of Appeals explained:

> We turn now to Singleton's claim that his due process rights were violated when he was placed in solitary confinement without a hearing. During the period relevant here, Singleton was a pretrial detainee. See Bell v. Wolfish, 441 U.S. 520, 534, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). While "pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in [disciplinary segregation] without explanation or review of their confinement." Bistrian v. Levi, 696 F.3d 352, 375 (3d Cir. 2012) (quoting Stevenson v. Carroll, 495 F.3d 62, 69 (3d Cir. 2007) ). Here, as in Bistrian, the District Court did not address Singleton's procedural due process claim; thus, as in that case, "we ask the Court to consider the issue in the first instance by examining the asserted purposes for [Singleton's] detention, and determining whether

sufficient process has been afforded." Id. (quotation marks, alterations omitted).

Singleton v. Superintendent Camp Hill SCI, 747 F. App'x 89, 92 (3d Cir. 2018). Therefore, the Court of Appeals "vacate[d] the District Court's judgment with respect to Singleton's claim that his detention in solitary confinement without a hearing violated his right to due process, and . . . remand[ed] for further consideration of that claim." Id. at 93.

While this much was clear from the Court of Appeals' decision, nothing in that decision analyzed, addressed, or acknowledged the fact that, for much of the time period embraced by this claim, Singleton's pretrial detainee status was later recast as a custodial sentence when the state court imposed a time-served sentence upon Singleton on January 7, 2014. Thus, the Court of Appeals' decision left one crucial question unresolved: How does Singleton's time-served sentence, which retroactively altered his custodial status, effect the scope of the sole remaining legal claim in this case a claim premised upon the fact that he was a pretrial detainee?

With this question unanswered, the parties proceeded to a pretrial conference with the court.[1] At this conference we raised this issue and invited guidance from

---

[1] Regrettably, we were unable to address these issues directly with Mr. Singleton at the time of this pretrial conference because Mr. Singleton was in custody on the date of the pretrial conference, having incurred a new state criminal charge.

counsel. We then received a number of competing recommendations from the parties. For his part, Singleton invites us to treat his conviction as a matter of no legal moment, asserting that:

> From January 7, 2013 through February 14, 2014, four hundred and three (403) days, Plaintiff was housed in solitary confinement and denied due process. The law is clear that Plaintiff should have been afforded *greater constitutional protection as a pretrial detainee* than an individual convicted of a crime and serving a sentence throughout this time.

(Doc. 151, at 2) (emphasis in original).

The defendant, in turn, offered two suggestions. First, Harry asserted that the defense should be able to present evidence relating to this legal thicket to the jury on the theory that Singleton had a duty to mitigate his damages by resolving his state case in a more timely manner. According to the defense:

> [I]t is noteworthy that Plaintiff received a sentence of 6 months to 1 year with credit from December 14, 2012. That means he reached his minimum as of June 14, 2013. Plaintiff had a duty to mitigate damages. Had Plaintiff not withdrew his guilty plea in May or June 2013, he could have shortened his stay at SCI-Camp Hill in E Building. The jury should be instructed on Plaintiff's duty to mitigate his damages.

(Doc. 150, at 2-3). Later the defendant advanced a somewhat different view, contending that Singleton's state time served sentence should, at a minimum, reduce

---

Commonwealth v. Singleton, CP-67-CR-0003297-2022.

the temporal scope of his pretrial detainee due process claim, since any period of incarceration credited against Singleton's time-served sentence cannot also be considered as part of a pretrial detainee claim. (Doc. 154).

Upon consideration of these contrasting views, as discussed below, we conclude that the fact of this time-served sentence has legal significance in defining the scope of Singleton's claim and cannot be wholly discounted as the plaintiff invites us to do. We also conclude, given the complexities of these interrelated periods of detention and time-served sentences, that the task of defining the scope of this claim cannot simply be left to a lay jury armed with some general mitigation instruction. Instead, we will define the scope of this claim, taking into account this curious confluence of events.

## II.  <u>Discussion</u>

At the outset, we note that the defendant has on various occasions encouraged us to entirely reject the notion that Singleton was a pretrial detainee at any time during 2013 and instead treat him as a convicted parole violator, a change in Singleton's legal status which would nullify his last remaining claim.

This we cannot do.

Our consideration of the scope of Singleton's remaining due process claim begins, as it must, with the law of the case. In this instance, the law of the case is

embodied in the Court of Appeals' 2018 decision which found that, as a person held on a parole violator warrant, Singleton was a pretrial detainee who did not have a liberty interest in being confined in the general prison population but did have a liberty interest in not being detained indefinitely in some heightened form of segregation without explanation or review of his confinement. Singleton, 747 F. App'x at 92. This broad characterization of Singleton's legal status, in turn, is consistent with a settled line of caselaw which has observed that:

> The United States Court of Appeals for the Third Circuit has expressly held that until parole is revoked, "a parole violator is no different than a pretrial detainee who is merely awaiting trial and who, until conviction and sentencing, cannot commence service of a term of imprisonment." U.S. v. Dobson, 585 F.2d 55, 59 (3d Cir. 1978).

Rosario v. Strawn, No. CV 19-1040, 2020 WL 6730975, at *6 (W.D. Pa. July 29, 2020), report and recommendation adopted, No. 2:19-CV-01040, 2020 WL 5810009 (W.D. Pa. Sept. 30, 2020), aff'd, No. 22-1312, 2022 WL 3151963 (3d Cir. Aug. 8, 2022).

In our view the law of the case, as expressed in the Court of Appeals' decision, and as embodied in this longstanding legal authority, treats an accused parole violator like Singleton as a pretrial detainee. Moreover:

> Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances. . . . The purpose of this doctrine is to promote the "judicial system's interest

in finality and in efficient administration."

Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1981) (quoting

Todd & Co., Inc. v. S.E.C., 637 F.2d 154, 156 (3d Cir. 1980)). The contours of this

settled doctrine were described by the United States Supreme Court in the following

terms:

> Unlike the more precise requirements of res judicata, law of the case is
> an amorphous concept. As most commonly defined, the doctrine posits
> that when a court decides upon a rule of law, that decision should
> continue to govern the same issues in subsequent stages in the same
> case.

Arizona v. California, 460 U.S. 605, 618 (1983) (citations omitted).

The "[l]aw of the case rules have developed 'to maintain consistency and

avoid reconsideration of matters once decided during the course of a single

continuing lawsuit.'" In re Pharmacy Benefit Managers Antitrust Litigation, 582

F.3d 432, 439 (3d Cir. 2009) (reversing arbitration order in antitrust case on law-of-

the-case grounds) (citations omitted). It is clear that "[t]he ... doctrine does not

restrict a court's power but rather governs its exercise of discretion." Id.

(quoting Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron Inc., 123

F.3d 111, 116 (3d Cir. 1997)). In exercising that discretion, however, courts should

"be loathe to [reverse prior rulings] in the absence of extraordinary circumstances

such as where the initial decision was clearly erroneous and would make a manifest

10

injustice." Id. (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)). In addition to that narrow class of cases where the prior ruling was manifestly unjust, the type of "extraordinary circumstances" that warrant a court's exercising its discretion in favor of reconsidering an issue decided earlier in the course of litigation typically exist only where (1) new evidence is available, or (2) a supervening new law has been announced. Id. (citing, Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir. 1997)).

Here, the defendant urges us to cast aside the law of the case entirely, arguing that the prior ruling of the Court of Appeals which described Singleton as a pretrial detainee was manifestly unjust. (Doc. 153, at 3-6). We disagree with this sweeping proposition since we find that the Court of Appeals' decision was entirely in accord with longstanding precedent. However, we find that there are material facts which were not addressed by the Court of Appeals in its decision that call for further consideration of the scope of this claim. Specifically, the Court of Appeals' decision did not address, and apparently did not consider, the potential impact of the time-served sentence imposed upon Singleton by the state court in January of 2014.

This time-served sentence has legal significance since it retroactively recast much of the initial pretrial detention experienced by Singleton to a period of custodial confinement. Simply put, the time-served sentence imposed upon

Singleton means that for some period of time that he was detained, he must now be considered a sentenced prisoner whose legal claims are governed by the Eighth Amendment, rather than as a pretrial detainee whose claims are controlled by the due process clause of the Fifth and Fourteenth Amendments. The distinction between the governing standards which control claims brought under the Eighth Amendment or Fifth Amendment is particularly significant in the instant case since Singleton's Eighth Amendment claims arising out of his confinement have been dismissed, Singleton v. Harry, No. 1:13-CV-02711, 2016 WL 4870510, at *5 (M.D. Pa. Aug. 4, 2016), report and recommendation adopted, No. 1:13-CV-2711, 2016 WL 4765901 (M.D. Pa. Sept. 13, 2016), and that decision was not challenged on appeal. Therefore, to the extent that Singleton's confinement is assessed through the legal lens of the Eighth Amendment given his status as a convicted defendant, the law of the case is that this claim fails as a matter of law.

We note that we are not alone in this view that imposition of a time-served sentence can fundamentally alter the scope of a pretrial detainee's due process claim. While counsel have pointed us to no cases discussing this precise set of circumstances, our research reveals that at least one other court has concluded that the subsequent imposition of a time-served sentence undermines any pretrial detainee due process claim for damages.

In <u>Ford v. Nassau Cnty. Exec.</u>, 41 F. Supp. 2d 392, 394 (E.D.N.Y. 1999), the plaintiff alleged that while incarcerated as a pretrial detainee, his due process rights under the Fifth Amendment were violated when he was forced to do prison work without compensation. The district court, however, rejected this claim. In doing so, the court found that Ford had pleaded guilty and received a time-served sentence, thus converting the legal status of his confinement from pretrial detention to a custodial sentence. In terms that are equally applicable here, the court concluded that this was a legally significant development, noting in part that:

> Having pled guilty and received a jail sentence of time served, or sixty days, which by definition encompassed the very period of time during which he claims he was unlawfully required to work, Ford has vitiated any claim under § 1983. Any labor which would have been appropriately required of a convicted inmate cannot now be found to have harmed him because he has not received greater punishment or deprivation of liberty than any other inmate sentenced to the same amount of time to which he was sentenced.

<u>Id.</u> at 400.

We find this rationale to be persuasive. While Singleton would ask us to treat his conviction and time-served sentence as wholly irrelevant to his pre-trial detention claims, we cannot. The immutable legal truth is that for much of the time at issue in this case, Singleton's detention has now been deemed as a matter of law to have been

13

service of a criminal sentence. To ignore this fact would confer upon Singleton a legal windfall that he is not entitled to enjoy.

Having determined that we must account for this time-served period of incarceration when defining the scope of any legal claims premised upon Singleton's status as a pretrial detainee, we turn to the issue of ascertaining precisely what the impact of this time-served sentence should be. In this regard, we are mindful that we are construing the effect of a time-served sentence imposed by a Pennsylvania state court. Therefore, we are persuaded that we should turn to state law when ascertaining how to allocate time-served credit between Singleton's Pennsylvania state criminal charge and his New York parole violation.

On this score, we find the reasoning of the Pennsylvania Supreme Court in Gaito v. Pennsylvania Bd. of Prob. & Parole, 488 Pa. 397, 403–04, 412 A.2d 568, 571 (1980), to be illuminating and controlling. In Gaito, the Supreme Court provided the following time-served credit rules for offenders like Singleton who faced both parole revocation and sentencing on a new crime charge:

> [I]f a defendant is being held in custody solely because of a detainer lodged by the Board and has otherwise met the requirements for bail on the new criminal charges, the time which he spent in custody shall be credited against his original sentence. If a defendant, however, remains incarcerated prior to trial because he has failed to satisfy bail requirements on the new criminal charges, then the time spent in custody shall be credited to his new sentence.

Id.

Applying this guidance, it appears that from December 17, 2012, when Singleton was first confined as an alleged parole violator, until April 19, 2013, when a nominal cash bail was imposed upon him, the plaintiff's sole legal status was that of an alleged parole violator and pretrial detainee. After April 19, 2013, and continuing through his guilty plea and sentencing on January 7, 2014, Singleton was held both as an alleged parole violator and as a prisoner who had not posted a cash bond. Further, upon imposition of a time-served sentence by the state court on January 7, 2014, by operation of state law, the time Singleton spent in custody because he failed to post bail would be credited to his new criminal justice sentence. In turn, the time Singleton spent detained based solely upon his alleged parole violation would comprise his term of pretrial detention for purposes of this Fifth Amendment claim.

Applying these principles, we find that the 263 days between April 19, 2013, and January 7, 2014, when Singleton was confined both as a parole violator and due to his failure to satisfy his bail, are properly attributed to his time-served sentence and cannot now form the basis for a pretrial detainee due process claim. In contrast, the 122 days between December 17, 2012, and April 18, 2013, when Singleton was

held solely as a parole violator represent the proper outer contours of this pretrial detainee due process claim.

There is, however, one further limiting factor in this case where the sole remaining defendant is the former superintendent at SCI Camp Hill, Laurel Harry. With respect to a prison supervisor like Defendant Harry, it is axiomatic that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was a prison supervisor when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendant actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997). In particular, with respect to a prison supervisor like Defendant Harry, it is well-established that: "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual

knowledge and acquiescence." <u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005) (quoting <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Recognizing that for a supervisory official like Defendant Harry personal involvement through personal direction or actual acknowledge and acquiescence in unlawful activity must be shown to sustain a constitutional tort claim, we note that there is no evidence that Defendant Harry directed Singleton's initial detention or custodial placement. As for the evidence relating to Defendant Harry's actual knowledge and acquiescence in any allegedly improper confinement of Singleton, the sole basis in the record for inferring such knowledge and acquiescence is the grievance filed by Singleton. On this score, the undisputed evidence shows that Singleton first filed this grievance on February 28, 2013. (Doc. 122-13). He received an initial unfavorable response to the grievance on March 18, 2013. (<u>Id.</u>) Singleton then appealed this unfavorable decision to Defendant Harry on March 20, 2013. On April 15, 2013, Singleton received Harry's reply to this grievance which stated that "[w]hile it may not be to your liking, you are in an appropriate housing unit." (<u>Id.</u>)

Given these essentially undisputed facts, it appears that the earliest date upon which it can be inferred that Defendant Harry, as a prison supervisor, had knowledge of Singleton's due process concerns as a pretrial detainee was March 20, 2013, the date upon which he first put Harry on notice of these concerns. Since supervisory

liability in civil rights claims must be premised upon actual knowledge and acquiescence, this date defines the presumptive starting point for this due process claim against Harry. Moreover, by virtue of the time-served sentence imposed upon Singleton, his confinement solely as a pretrial detainee came to an end on April 18, 2013, some 29 days later. In our view, this finite time period represents the proper scope of Singleton's pretrial detainee due process claim against Defendant Harry.

In reaching these conclusions regarding the proper scope of Singleton's due process claim, we are acutely aware that we are altering the legal terrain in this case significantly for all parties. We are, however, obliged to follow this course prior to trial given the legal uncertainty and ambiguities which have until today shrouded the scope of this last remaining claim. Mindful of the impact of our ruling, we are taking the following steps: In addition to defining the temporal scope of this claim, we will order the parties to immediately consult and confer with one another and notify the court in writing within ten days from today's date concerning whether the parties: (1) wish to pursue further settlement or mediation discussions; or (2) request that the court certify this ruling for consideration of an interlocutory appeal.[2]

---

[2] On this score we note for counsel that 28 U.S.C. §1292(b) provides that:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order

18

An appropriate order follows.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

---

involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYRONE SINGLETON,** | : | **Civil No. 1:13-CV-2711** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LAUREL HARRY,** | : | |
| | : | |
| **Defendant.** | : | |

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, IT IS ORDERED that the temporal scope of the plaintiff's sole remaining due process claim against Defendant Harry is defined as follows: The scope of this claim commences on March 20, 2013, the date upon which Singleton first put Harry on notice of his custodial concerns as a pretrial detainee, and by virtue of the time-served sentence imposed upon Singleton, his confinement solely as a pretrial detainee came to an end on April 28, 2013, some 29 days later.

IT IS FURTHER ORDERED THAT the parties shall immediately consult and confer with one another and notify the court in writing **within ten days from today's** date on or before July 17, 2023, concerning whether the parties: (1) wish to pursue further settlement or mediation discussions; or (2) request that the court certify this

20

ruling for consideration of an interlocutory appeal. If the parties notify us that they elect not to pursue mediation or an interlocutory appeal, we will schedule this case for trial.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: July 7, 2023